# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| William P. Burnette, a single man, and Tracie Garnett, individually and on behalf of the Estate of William Burnette III,<br><br>Plaintiffs,<br><br>vs.<br><br>Sierra Nevada Corporation; New Frontier Innovations, LLC,<br><br>Defendants. | 2:14-cv-2761 JWS<br><br>ORDER AND OPINION<br><br>[Re: Motions at doc. 40 and 53] |

## I. MOTIONS PRESENTED

At docket 40, Defendant New Frontier Innovations, LLC ("NFI") filed a motion for summary judgment in its favor as to the wrongful death and negligence claims brought by Plaintiff Tracie Garnett ("Plaintiff") on behalf of herself and the estate of her son, William Burnette III ("Burnette"), arguing that such state law tort claims are preempted by the exclusive remedy provision in the Defense Base Act ("DBA").[1] Plaintiff filed her

---

[1] 42 U.S.C. § 1651 *et seq*. Burnette's father, William P. Burnette, originally filed this lawsuit. He and the defendants agreed to a settlement (Doc. 41), and his claims have been dismissed (Docs. 59, 64). NFI had filed a motion for summary judgment as to plaintiff

response under seal at docket 47. NFI's sealed reply is at docket 70.

At docket 53, Defendant Sierra Nevada Corporation ("SNC") filed a motion to dismiss pursuant to Rule 12(b)(1) based on the DBA's exclusive remedy provision. The motion was filed under seal. Plaintiff's sealed response is at docket 79. SNC's sealed reply is at docket 83.

Oral argument as to both motions was heard on September 17, 2015.

## **II. BACKGROUND**

On October 5, 2013, Burnette was working as a sensor operator on board a plane that was conducting an airborne counter-narcotics surveillance mission when the plane crashed near the border of Panama and Columbia killing Burnette and three other crew members. The surveillance mission was conducted in conjunction with a service contract between SNC and a division of the United States Air Force ("Prime Contract"). Pursuant to such contract, SNC agreed to provide, maintain, and operate aircraft that would "conduct maritime centric, mid-range, high endurance, wide-area detection and monitoring (D&M) of Service Targets of Interest" and conduct "D&M operations against suspected illicit trafficking targets/events against aircraft and against targets on land"[2] for the Joint Interagency Task Force South (JIATF-S), a military entity responsible for the detection and monitoring of suspect air and maritime drug activity in

---

Burnette's claim at docket 28, but because of the settlement, that motion was dismissed as moot. NFI's motion at docket 40 nonetheless incorporates the arguments set forth in docket 28.

[2]Doc. 29-3 at p. 46 (Prime Contract at p. SNC0000045).

2

the Latin America region.³ The surveillance project outlined in the Prime Contract was referred to as the Prospector Program. SNC was responsible for conducting the surveillance activities and transmitting the results over a secure data link to JIATF-S.⁴ SNC, in turn, subcontracted with NFI to provide the personnel—such as pilots and sensor operators—for the Prospector Program missions. The NFI's subcontract with SNC ("Subcontract") was in direct support of SNC's Prime Contract with the military.

Both the Prime contract and the Subcontract were "certified for national defense use" as a priority defense contract under federal law.⁵ The Prime Contract required SNC to obtain federal workers' compensation insurance pursuant to the DBA and required that any SNC subcontract also contain a DBA insurance requirement.⁶ The Subcontract in turn required NFI to provide workers' compensation insurance coverage to employees performing work under the Subcontract, including DBA insurance.⁷ NFI secured insurance. NFI's policy included "International Mandatory Workers Compensation Coverage" for "Defense Base Employees" and listed the Prime Contract among the covered projects.⁸ The policy term was February 4, 2013 through February

---

³Doc. 28-2 at p. 5. (United States Air Force Aircraft Accident Investigation Board Report, at p. 3).

⁴Doc. 29-3 at p. 46 (Prime Contract, Statement of Work, at p. 2, SNC0000045).

⁵Doc. 29-3 at p. 26 (Prime Contract at p. 25, SNC0000025); Doc. 29-2 at p. 16 (Subcontract at p. 8, NFI000015).

⁶Doc. 29-3 at p. 18 (Prime Contract at p. 17, SNC0000017) (incorporating 48 C.F.R. § 52-228.03).

⁷Doc. 47-1 at p. 42 (Subcontract at p. 5, NFI000042).

⁸Doc. 47-4 at pp. 21-22 (NFI Insurance Policy CHUBB000021-22).

4, 2014, and was therefore in effect at the time of the accident in October 2013.[9] A few days before the accident, NFI confirmed with its insurer that its coverage applied to Prospector Program operations in Panama.[10]

NFI hired Burnette to be a sensor operator specifically for the Prospector Program. He began work on March 27, 2013. After a training course in Colorado, he was sent to Panama. At the time of the fatal crash, Burnette was performing his surveillance duties near the border of Panama pursuant to the Prime Contract and Subcontract. After the crash, NFI notified its DBA insurer of the accident, and the insurer subsequently paid eligible funeral expenses for Burnette's funeral as required by the statute.[11] Decedent was not married at the time of the accident and did not have any minor children or other dependents who would be eligible for payment of any death benefits under the DBA.

## III. STANDARD OF REVIEW

SNC brought its motion pursuant to Rule 12(b)(1), asking the court to dismiss Plaintiff's claims for lack of subject matter jurisdiction. It argues that because the Plaintiff's claims are preempted by the exclusive remedy provision of the DBA, the court lacks jurisdiction. It then argues that because the jurisdictional issue is separate from the underlying merits of the case, the court can consider outside evidence and resolve any factual disputes if necessary. The court concludes, however, that the issues

---

[9] *Id.* at p. 21.

[10] Doc. 29-1 at p. 3 (Suthar Declaration at ¶ 8).

[11] *Id.* (Suthar Declaration at ¶ 10).

4

regarding the DBA are better raised in a motion for summary judgment, like the one brought by NFI. As noted by the Fifth Circuit, "the applicability of the DBA's exclusivity provision . . . presents an issue of preemption, not jurisdiction."[12] "Federal preemption is an affirmative defense that a defendant must plead and prove" and as such it should ordinarily be raised in a Rule 12(c) motion for judgment on the pleadings or a Rule 56 motion for summary judgment.[13] Thus, the court will consider SNC's motion to be one for summary judgment.

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[14] The materiality requirement ensures that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[15] Ultimately, "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the nonmoving party."[16] However, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[17]

The moving party has the burden of showing that there is no genuine dispute as

---

[12]*Fisher v. Halliburton*, 667 F.3d 602, 609 (5th Cir. 2012).

[13]*Id.*

[14]Fed. R. Civ. P. 56(a).

[15]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[16]*Id.*

[17]*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

5

to any material fact.[18]  Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, the moving party need not present evidence to show that summary judgment is warranted; it need only point out the lack of any genuine dispute as to material fact.[19]  Once the moving party has met this burden, the nonmoving party must set forth evidence of specific facts showing the existence of a genuine issue for trial.[20]  All evidence presented by the non-movant must be believed for purposes of summary judgment and all justifiable inferences must be drawn in favor of the non-movant.[21]  However, the non-moving party may not rest upon mere allegations or denials, but must show that there is sufficient evidence supporting the claimed factual dispute to require a fact-finder to resolve the parties' differing versions of the truth at trial.[22]

## IV.  DISCUSSION

The DBA is a uniform, federal compensation scheme.  It extends workers' compensation covered under the Longshore and Harbor Workers' Compensation Act ("LHWCA") to employees of certain types of federal contractors.  Specifically the DBA applies, inter alia, to:

> any employee engaged in any employment . . . under a contract entered into with the United States [or any component thereof] . . . or any subcontract, . . . where such contract is to be performed outside

---

[18]*Id.* at 323.

[19]*Id.* at 323-25.

[20]*Anderson,* 477 U.S. at 248-49.

[21]*Id.* at 255.

[22]*Id.* at 248-49.

6

the continental United States . . . for the purpose of engaging in public work . . . .²³

The compensation scheme of the LHWCA governs a claim under the DBA except to the extent the DBA specifically modifies a provision of the LHWCA.²⁴ Like the LHWCA, the DBS has an exclusive remedy provision; that is, the employer's obligation to secure federal workers' compensation benefits is in lieu of any other liability under state or federal law. "If an employee's injury is covered under the DBA, he is generally precluded from pursuing a tort claim against his employer to recover for the same injury."²⁵

> Like the LHWCA and other worker's compensation statutes, the DBA represents a compromise between employees and their employers [whereby] "[e]mployers relinquish[ ] their defenses to tort actions in exchange for limited and predictable liability," and "[e]mployees accept the limited recovery because they receive prompt relief without the expense, uncertainty, and delay that tort actions entail.²⁶

**A.    Public work**

Based on the statute, the DBA's compensation scheme and exclusive remedy provisions apply here if 1) Burnette's death occurred while he was performing services pursuant to a contract with the United States; 2) the contract was to be performed outside the United States; and 3) the contract was "for the purpose of engaging in

---

²³42 U.S.C. § 1651(a)(4).

²⁴42 U.S.C. § 1651(a) ("Except as herein modified, the provisions of the [LHWCA] . . . shall apply in respect to the injury or death of any employee engaged in [the types of employment described below]").

²⁵*Fisher*, 667 F.3d at 610.

²⁶*Id.* (quoting *Morrison–Knudsen Constr. Co. v. Dir., Office of Workers' Comp. Programs*, 461 U.S. 624, 636 (1983)).

7

public work." The parties do not dispute that Burnette was injured while performing his job as a sensor operator overseas pursuant to the Prime Contract and Subcontract. Plaintiff, however, argues that the Prime Contract and, consequently the Subcontract, were not related to "public work" and thus the DBA's exclusive remedy provision is not applicable.

Under the DBA, public work is defined as:

> any fixed improvement or any project, whether or not fixed, involving construction, alteration, removal or repair for the public use of the United States or its allies, including but not limited to projects or operations under service contracts and projects in connection with the national defense or with war activities . . . .[27]

It includes not only physical construction projects but also any "projects in connection with the national defense or with war activities." The DBA further defines war activities as those "directly relating to military operations."[28] The term has been interpreted broadly to include service contracts related to a federal construction project or service contracts with a nexus to national defense or military operations.[29]

Here, the accident at issue occurred during a mission to carry out a contract that satisfied the DBA, because the Prime Contract, and the Subcontract by extension, had a clear nexus to national defense. Both the Prime Contract and the Subcontract were

---

[27] 42 U.S.C. § 1651(c).

[28] 42 U.S.C. §1651(b)(3).

[29] *Flying Tiger Lines, Inc. v. Landy*, 340 F.2d 46 (9th Cir. 1966) (noting that the DBA is broad enough to encompass a civilian contract to transport military personnel from an Air Force base in California to Vietnam); *Univ. of Rochester v. Hartman*, 618 F.2d 170, 173-74 (2d Cir. 1980) ("The sine qua non of the [DBA's] applicability has always been a military or a United States government construction connection. There is no reason to support that a service contract is exempt from this prerequisite.").

8

expressly designated by the federal government as priority "rated order[s] certified for national defense use," meaning that the contracts received priority over other federal contracts because the work associated with them was deemed necessary or appropriate for the promotion of national defense.[30] Moreover, the Department of Defense is the agency designated by Congress to detect and monitor "aerial and maritime transit of illegal drugs into the United States."[31] Efforts to disrupt and dismantle transnational organized crime networks and reduce availability of illicit drugs and inhibit terrorist funding have been recognized as part of the larger effort to improve national security.[32]

In another action arising out of the same accident, *Moore v. United States*, a federal district court held that the tort claims brought by the estate and survivors of another NFI employee killed in the accident were preempted by the DBA.[33] The court in *Moore* concluded that the situation was comparable to the one in *Vance v. CHF*, where a federal district court held that an overseas workforce development contract was sufficiently related to national defense because the work was undertaken for the purpose of countering the influence of extremist and terrorist groups.[34] The court

---

[30]See 50 U.S.C. App. § 2071(a); 15 C.F.R. §§ 700.2, 700.3.

[31]10 U.S.C. § 124(a)(1).

[32]*See* President Obama's Strategy to Combat Transnational Organized Crime: Addressing Converging Threats to National Security 24-25 (July 2011), *available at* https://www.whitehouse.gov/sites/default/files/Strategy_to_Combat_Transnational_Organized_Crime_July_2011.pdf.

[33]*Moore v. United States*, No. 2:14-cv-00049, Order Granting Defendant New Frontier Innovation, LLC's Motion for Judgment (S.D. Tex. Oct. 29, 2014) (Doc. 28-1).

[34]*Vance v. CHF Int'l*, 914 F. Supp. 2d 669 (D. Md. 2012).

agrees with the reasoning and conclusion by the court in *Moore* that "the point of missions like the one carried out by [the decedent] is to counteract terrorist influence and improve national security" and thus the contracts pursuant to which Burnette was working were sufficiently linked to national defense.[35]

**B.   Contractual language**

Plaintiff argues that, in order for the DBA exclusive remedy provision to apply, precise language regarding obtaining and maintaining DBA insurance as set forth in the statute must be included in all contracts and subcontracts. The DBA's insurance requirement states as follows:

> . . . [E]very [applicable contract] shall contain provisions requiring that the contractor (and subcontractor . . . ) (1) shall, before commencing performance of such contract, provide for securing to or on behalf of employees . . . the payment of compensation and other benefits under the provision of this chapter, and (2) shall maintain in full force and effect during the term of such contract [or] subcontract . . . or while employees are engaged in work performed thereunder, the said security for the payment of such compensation and benefits. . .[36]

The Subcontract included such a DBA insurance provision. It stated as follows: "In accordance with FAR 52.228-3, [NFI] shall obtain [DBA] Insurance for their employees and subcontractors; or insure that their subcontractors, at all tiers, acquire DBA insurance for their employees."[37] It went on to provide that such insurance must be the "minimum kind and amount of insurance *during* performance of [the] contract as

---

[35]*Moore*, at p. 5. (Doc. 28-1 at p. 6).

[36]42 U.S.C. § 1651(a)(4).

[37]Doc. 47-1 at p. 12 (Subcontract at p. 5, NFI1000012).

10

required by [the applicable regulation]."[38] FAR 52.228-3 is a Federal Acquisition Regulation that contains a model provision to include in DBA contracts. The model provisions states:

> The Contractor shall (a) provide, before commencing performance under this contract, such workers' compensation insurance or security as the [DBA] requires and (b) continue to maintain it until performance is completed.[39]

The provision goes on to require that all subcontracts have a "similar" provision.

Plaintiff argues that the Subcontract did not contain the exact language mandated in FAR 52.228-3. She emphasizes that the Subcontract did not specifically note that NFI was required to *maintain* its insurance. As noted by NFI, however, "[t]he statutory language requiring that DBA contracts address workers' compensation insurance requirements, . . . is not a predicate for application of the DBA's exclusive remedy provision."[40] The statute's exclusive remedy is set aside only where an employer actually fails to secure the required workers' compensation insurance.[41] Plaintiff points to no other language in the DBA, nor does she cite any case law, that would permit an injured worker to avoid the statute's exclusive remedy provision on the grounds that the precise statutory language was not included verbatim in the relevant contract. Indeed, the Benefits Review Board—the appeal board for DBA benefits determinations—has rejected such an argument in *Davis v. Morganti National, Inc*.[42]

---

[38]*Id.* (emphasis added).

[39]48 C.F.R. § 52.228-3.

[40]Doc. 70 at p. 5.

[41]33 U.S.C § 905(a) (LHWCA provision incorporated into the DBA).

[42]BRB No. 99-0280, 1999 WL 35135449 (Nov. 17, 1999).

11

The board in that case found that the statue's requirement for a DBA insurance provision in a covered contract merely creates a legal obligation for those entering into covered contracts but does not add an additional jurisdictional requirement.[43]

Regardless, the court concludes that the Subcontract's DBA insurance provision was adequate. As noted above, the Subcontract stated that "in accordance with FAR 52.228-3" NFI had to obtain DBA insurance for their employees and subcontractors and it had to be in place "during performance of [the Subcontract]." Also, it is undisputed that NFI had such insurance at the time of the accident. Plaintiff is "splitting hairs" in suggesting that the Subcontract does not comply with the regulations or the statute because its language is somehow less than precise. The meaning of the language is clear, and it is sufficiently similar to FAR 52.228-3 to meet the requirements set forth for subcontracts therein.

**C.    NFI's insurance policy**

Plaintiff also argues that certain deficiencies in NFI's insurance policy render the DBA's exclusive remedy provision inapplicable. As NFI notes, this is not an insurance coverage dispute. NFI's insurance policy included DBA coverage, specifically covering NFI's performance in relation to the Prime Contract. Moreover, it is undisputed that NFI's insurance company paid DBA benefits here. Thus, the relevancy of the particularities of the coverage is doubtful at best. The court will nonetheless address Plaintiff's specific arguments.

First, Plaintiff points out that the policy term did not match the Subcontract term.

---

[43]*Id*. at *2.

12

The policy term was February 2013 through February 2014, while the Subcontract term was May 2013 through May 2014. Plaintiff cites no authority requiring that the insurance policy's term match the contract's term, nor does she cite any cases where the DBA's exclusive remedy provision was held to be inapplicable on the basis of such a timing difference. The crucial fact here is that NFI's insurance policy was in effect in October 2013 at the time of the accident.

Second, Plaintiff asserts that the policy specifically excluded the type of loss suffered by Burnette. While the policy's standard workers' compensation coverage– which provided coverage for NFI's liability under various workers compensation laws– excluded federal workers' compensation scheme, such coverage could nonetheless "be arranged by amendment to the policy," which is what happened here.[44] The policy also provided for "employer's liability coverage," which was separate from the policy's workers' compensation coverage. The exclusion for injuries to aircraft crew or DBA employees that Plaintiff relies on applies to the employer's liability coverage, not the workers' compensation coverage.[45]

Third, Plaintiff argues that the policy may have specifically covered NFI's performance under the Prime Contract but the policy indicated that the location of the project would be in Mexico, not Panama.[46] Plaintiff therefore asserts that coverage only applied to the extent that the work took place in Mexico. There is nothing to suggest

---

[44] Doc. 47-4 at p. 30 (NFI Insurance Policy at p. CHUBB00030).

[45] Id. at pp. 37-38 (NFI Insurance Policy at pp. CHUBB00037-38).

[46] *Id.* at p. 22

13

that the location of the DBA project was determinative here.  Indeed, the insurance company paid benefits in relation to the October 2013 accident, and, as explained in an undisputed declaration attached to NFI's motion, NFI confirmed with its insurance carrier that the policy covered Prospector Program operations occurring in Panama.[47]

**D.      Plaintiff's claims against SNC**

The DBA makes workers' compensation benefits the exclusive remedy of a covered employee against his "employer."  It is undisputed that NFI hired Burnette and that Burnette was at all times an employee of NFI.  However, SNC argues that the DBA's exclusive remedy provision nonetheless applies to bar Plaintiff's claims against it because the term "employer" extends to a borrowing employer under the "borrowed servant" doctrine and that, here, Burnette was its borrowed employee at the time of the accident.

While the Ninth Circuit has not specifically applied the borrowed servant doctrine as a defense under the LHWCA or the DBA, it recognizes the doctrine in other contexts.[48]  The doctrine has been applied to the LHWCA by lower courts within the Ninth Circuit.[49]  Moreover, other circuits, well as the Benefits Review Board, have uniformly concluded "that the concept of an employer as used in the LHWCA includes

---

[47]Doc. 29-1 at p. 3 (Suthar Declaration at ¶ 8).

[48]*See Park v. Joe Lujan Enters., Inc.*, 848 F.2d 118, 119-20 (9th Cir. 1987) ("This court has recognized the borrowed servant doctrine.").

[49]*See Rodriguez v. Barge FOSS*, No. C97-1832Z, 1998 WL 1110351, at *3-4 (W.D. Wash. Nov. 4, 1998).

14

firms considered borrowing employers under the borrowed servant doctrine."[50] The court sees no reason to take a contrary position here. Indeed, Plaintiff does not address the issue in her response brief, impliedly conceding that the borrowed servant doctrine can apply under the DBA.

Plaintiff's opposition to SNC's argument is that SNC was not a borrowing employer here and that Burnette was at all times working under the control of NFI. In order to determine whether an employee is the employee of his original employer or the borrowed employee of another, courts have relied on the factors set forth in *Ruiz v. Shell Oil Co.*[51] Those factors are:

(1) Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?

(2) Whose work is being performed?

(3) Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?

(4) Did the employee acquiesce in the new work situation?

(5) Did the original employer terminate his relationship with the employee?

(6) Who furnished tools and place for performance?

(7) Was the new employment over a considerable length of time?

(8) Who had the right to discharge the employee?

---

[50]*Peter v. Hess Oil Virgin Islands Corp.*, 903 F.2d 935, 940 (3d Cir. 1990); *see also, e.g., Langfitt v. Fed. Marine Terminals, Inc.*, 647 F.3d 1116, 1119 (11th Cir. 2011); *Gaudet v. Exxon Corp.*, 562 F.2d 351, 355 (5th Cir. 1977); *White v. Bethlehem Steel Corp.*, 222 F.3d 146, 149 (4th Cir. 2000); *Fitzgerald v. Stevedoring Servs. of Am.*, BRB No. 00–0724, 2001 WL 94757, at *4 (B.R.B. Jan. 31, 2001) (en banc).

[51]413 F.2d 310 (5th Cir. 1969).

(9) Who had the obligation to pay the employee?[52]

*Ruiz* focused its analysis on which employer, at the time of the injury, had the right to control the employee and was having its work performed by the employee. In a subsequent case, *Gaudet v. Exxon Corp*,[53] the court refined and explained how to best apply the factors. There, the Fifth Circuit explained that in the context of the LHWCA, and consequently the DBA, the borrowed servant doctrine is not being used as a "device to impute liability" but rather as "a means to escape it through the exclusive remedy provisions."[54] As such, "[t]he traditional borrowed employee test, with its emphasis on control . . . should not be blindly applied" to the LHWCA context.[55] Of primary importance in the LHWCA in addition to control is whether the "employee could reasonably be presumed to have evaluated the risks of the work situation and acquiesced thereto."[56] Therefore, based upon *Gaudet* and subsequent cases, when determining whether another company can be considered a borrowing employer for purposes of the LHWCA and DBA, and thus can receive the benefit of the acts' exclusive remedy provisions, the court must look at: (1) which entity's work was being done at the time of the injury; (2) whether the employee consented to the new employment relationship; and (3) whether the borrowing entity had control over the employees work, which could be evidenced by any agreements, the actual practice of

---

[52]*Gaudet*, 562 F.2d at 355 (citing *Ruiz*, 413 F.2d at 312-13).

[53]562 F.2d 351 (5th Cir. 1977).

[54]*Id.* at 356.

[55]*Id.* at 357.

[56]*Id.*

16

the parties, the furnishing of space and equipment, the right to terminate the employee, and the obligation to pay the employee.[57]

Here, it is undisputed that Burnette was specifically hired in conjunction with the Subcontract and the work he performed was in furtherance of SNC's obligations under the Prime Contract. Thus, he was performing SNC work at the time of the accident. The undisputed facts also demonstrate that Burnette consented to the employment relationship and knew he would be performing work for SNC. He was told that he would be performing work for a "Prime Contractor" and its "U.S. Government" customer. He was informed of the military nature of the project and the risks involved. He went to training provided by SNC shortly after being hired in March of 2013 and worked up through the accident, October 5, 2013. Indeed, Burnette indicated that he worked for SNC on his airport identification card application.

However, there are disputed issues of fact related to who actually controlled Burnette's work at the time of the incident. While SNC provided facilities such as offices, storage, hangers, and housing at the Prospector Program operating location, the parties dispute who actually managed personnel there. SNC provided an affidavit from one of SNC's Program Managers. The affidavit states that there was a SNC site manager at the location who was in charge of personnel assignments and debriefing.[58] In response, Plaintiff submits a contradicting affidavit from a pilot who also worked for

---

[57]*Langfitt v. Fed. Marine Terminals, Inc.*, 647 F.3d 1116, 1127-28 (11th Cir. 2011) (explaining and applying *Gaudet*).

[58]Doc. 53-1 at p. 4 (Padilla Affidavit at ¶ 10).

17

NFI as part of the Prospector Program and who was aboard the airplane that crashed.[59] He states that the military, not SNC, was in charge of scheduling, assignments, and briefings, and that any adjustments made to such things were coordinated between the military and NFI. He states that NFI maintained control over all administrative aspects related to its employees while they were based overseas, and that "[n]obody from SNC was in a position to tell [the NFI employees] what to do." In addition to the affidavit, the Subcontract raises issues regarding control. Under the Subcontract, NFI was responsible for "supervising techniques" used by their personnel.[60] While SNC maintained "the right to remove any [NFI] employee from the agreement," it nevertheless had to consult with NFI before doing so.[61] Given that SNC's motion must be considered as one for summary judgment, this court cannot weigh the evidence; Plaintiff's evidence must be believed for purposes of summary judgment. Plaintiff's evidence is sufficient to establish the existence of disputed facts related to which entity actually had control over Burnette and other NFI employees. Given these disputed issues of fact on matters that are relevant to the court's decision on the issue of borrowed employment, summary judgment is not appropriate.[62]

## V. CONCLUSION

For the reasons set out above, Defendant NFI's motion for summary judgment at

---

[59]Doc. 79-2 (Clouser Affidavit).

[60]Doc. (Subcontract at p. 5, NFI000012).

[61]*Id.*

[62]*Gaudet*, 562 F.2d at 357-58 (noting that summary judgment can be appropriate when the "determinative factual ingredients" are not disputed).

18

docket 40 is GRANTED.  Defendant SNC's motion at docket 53 is DENIED.

DATED this 17th day of September 2015.


                                    /S/
                            JOHN W. SEDWICK
                    UNITED STATES DISTRICT JUDGE